## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 13 2017, 11:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Lisa M. Johnson
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Tyler G. Banks
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Frank Larkins, III<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 13, 2017<br><br>Court of Appeals Case No.<br>49A02-1611-CR-2516<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark D. Stoner, Judge<br><br>Trial Court Cause No.<br>49G06-1411-MR-52285 |

**Najam, Judge.**

# Statement of the Case

Frank Larkins, III appeals his convictions for aggravated battery, as a Level 1 felony, and neglect of a dependent, as a Level 1 felony, following a jury trial. He presents two issues for our review:

> 1. Whether the trial court abused its discretion when it denied his motion to sever his trial from his codefendant's trial.
>
> 2. Whether the State presented sufficient evidence to support his convictions.

We affirm.

# Facts and Procedural History

In February 2013, Diamond Miller and her son D.P. were living with Diamond's father, William Miller, when she gave birth to her son E.P. Sometime in 2013, Diamond began dating Larkins, and in December 2013, Diamond, D.P., and E.P. began living with Larkins and Larkins' elderly great grandmother, Gladys Brasher. Diamond and Larkins then had a daughter together, M.M.

On Friday, October 24, 2014, Diamond dropped off D.P. and E.P. at William's house for the weekend. E.P. showed no signs of illness over the weekend. On Monday, October 27, at approximately 4:30 p.m., Larkins and Diamond met William, D.P., and E.P. in a parking lot, and, while Larkins stayed seated in the driver's seat of his truck, Diamond and William helped the boys move from

William's car into Larkins' truck. As E.P. entered the truck, E.P. and Larkins made eye contact, and William observed that E.P. "looked spooked" as though he had "seen a ghost." Tr. Vol. 3 at 18-19. William then drove Diamond to work, and Larkins drove D.P. and E.P. to Larkins' brother's house for a visit. Larkins' brother Bryant was living with his girlfriend Jayna Tramble and Bryant's children at the time. D.P. and E.P. played with Bryant's children while Larkins visited with Bryant and Tramble for a couple of hours.

[5] After leaving Bryant's residence, at approximately 6:30 p.m., Larkins drove D.P. and E.P. home. Larkins' then eighty-five-year-old great grandmother, Brasher, was home that evening, but she mostly stayed in her bedroom with the door closed. When Diamond got home from work at approximately 10:00 p.m., Larkins, D.P., and E.P. were eating dinner. But E.P. only took two bites of food and spit them out. E.P. complained of stomach pain. A short time later, Diamond called William to ask him what E.P. had eaten over the weekend. William reported that E.P. had eaten normally and seemed to be fine over the weekend. At some point, E.P. went to sleep for the night.

[6] On Tuesday, October 28, E.P. was lethargic and sick to his stomach. E.P. did not eat, and he vomited every time he tried to drink fluids. E.P. vomited eight to ten times that day. E.P.'s stomach was distended, but it "deflate[d]" after he vomited. Tr. Vol. 2 at 97. E.P. stayed still as much as possible to minimize the pain he was having. E.P. went to sleep at approximately 6:00 p.m. Diamond and Larkins heard E.P. moaning in pain in his bed, but he eventually quieted down.

[7] At a little before 8:00 a.m. on Wednesday, October 29, Diamond found E.P. unresponsive in his bed. Diamond woke Larkins, and they called 9-1-1. The 9-1-1 operator instructed Larkins to perform chest compressions on E.P. while they waited for emergency medical technicians ("EMT") to arrive. When the EMTs arrived, they found Larkins giving chest compressions to E.P., who was lying on the floor in a hallway. EMT John Longstreet determined that E.P. was dead and was exhibiting rigor mortis, which indicated that E.P. had been dead for "an extended period of time." *Id.* at 28. Indianapolis Metropolitan Police Department officers and a deputy coroner, Jessica Miller, soon arrived at the apartment. At some point, Larkins told Miller that he "had an interest in" television shows involving medical diagnoses, and he asked her "what kind of injuries would cause [E.P.'s] abdomen to be found distended or rigid." *Id.* at 103. And Larkins asked Miller if she would be able to determine the cause of an abdominal injury to E.P. Miller told a homicide detective at the scene about Larkins' questions.

[8] Larkins and Diamond gave voluntary statements to police officers. They explained that they thought E.P. had a stomach virus on Tuesday and that they had intended to take him to get medical treatment on Wednesday if he was not feeling better.

[9] Dr. Thomas Sozio conducted an autopsy and concluded that E.P. had died from an infection after he suffered blunt force trauma to his abdomen akin to what would be sustained in a "high speed car accident." *Id.* at 199. In

particular, Dr. Sozio found that E.P's duodenum[1] had been severed such that "it had completely separated and it was torn in two pieces." *Id.* at 178. Dr. Sozio also found: a partial laceration to E.P.'s pancreas; a large amount of blood and pus in E.P's abdomen; "some fat that had been torn"; and signs of an infection. *Id.* at 177. Dr. Sozio concluded that if E.P. had received timely medical care after the impact injury, he could have had surgery to repair his injuries and treat the infection that ultimately killed him.

[10] The State charged Larkins with murder, a felony; aggravated battery, as a Level 1 felony; two counts of neglect of a dependent, as Level 1 felonies; battery, as a Level 2 felony; and two counts of battery, as Level 5 felonies.[2] And the State charged Diamond with two counts of neglect of a dependent, as Level 1 felonies. When the State indicated that it would try Larkins and Diamond together in a single trial, Larkins moved to sever the trials. The trial court denied that motion after a telephonic hearing.

[11] During the joint trial, the State presented expert testimony that E.P. died approximately eighteen to thirty-six hours after sustaining the blunt force trauma to his abdomen. No one could pinpoint the time of E.P.'s death, but the evidence showed that, because E.P. was exhibiting rigor mortis when EMTs arrived at 8:00 a.m. on October 29, he had "likely" been dead "for hours" at

---

[1] The duodenum is the "first part of the small intestine after the stomach." Tr. Vol. 2 at 177.

[2] Prior to trial, the State dismissed the two Level 5 felony charges against Larkins.

that point. Tr. Vol. 3 at 97. And while there was no evidence to pinpoint the time of injury, Dr. Harris testified that it "would have happened after" E.P. had been playing with the kids at Bryant's house, which was when Larkins was home with D.P. and E.P. on Monday evening. *Id.* at 93. Finally, the State presented expert testimony that the blunt force trauma to E.P.'s abdomen was not the result of a fall and could not have been inflicted by another child.

[12] At the conclusion of trial, the jury found Larkins guilty of all but the murder charge, upon which the jurors could not find unanimity.[3] The trial court entered judgment of conviction for aggravated battery, as a Level 1 felony, and neglect of a dependent, as a Level 1 felony. The court sentenced Larkins to concurrent thirty-four year sentences, with twenty years in the Department of Correction, eight years on work release, six years suspended, and two years on probation. This appeal ensued.

# Discussion and Decision

## *Issue One: Motion to Sever Trials*

[13] Larkins first contends that the trial court abused its discretion when it denied his motion to sever his trial from Diamond's trial. Indiana Code Section 35-34-1-11(b) provides in relevant part that, upon a defendant's motion, the court shall order a separate trial of codefendants whenever the court determines that a

---

[3] The jury found Diamond guilty of one count of neglect of a dependent, as a Level 1 felony. We affirmed her conviction on appeal. *Miller v. State*, No. 49A02-1610-CR-2364, 2017 WL 1632534 (Ind. Ct. App. May 2, 2017).

separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant. But there is a strong judicial policy in favor of joint trials where codefendants are charged with the same crime. *Lee v. State*, 684 N.E.2d 1143, 1149 (Ind. 1997). The trial court has discretion to grant or deny a motion for separate trials. *Id.* at 1147. In order to show an abuse of discretion in the denial of a motion for separate trials, the defendant must show actual prejudice. *Id.* at 1148. It is the defendant's burden to show that a fair trial could not otherwise have been had and "not merely that severance would enhance the prospects for acquittal." *Id.* at 1149 (quoting *Blacknell v. State*, 502 N.E.2d 899, 905 (Ind. 1987)).

[14] Larkins maintains that, over his objection, the trial court permitted the State to present evidence against Diamond that "would not have been admissible" if Larkins had been tried separately. Appellant's Br. at 29. In particular, the State presented William's testimony that, after Larkins and Diamond began living together, William: saw bruises "all over" E.P. "about every time" he saw him; repeatedly talked to Diamond about the bruises; disagreed with Diamond's conclusion that the bruises were just a result of play with other kids; and told Diamond not to let "anybody watch the kids." Tr. Vol. 3 at 10-11. William testified that Larkins was regularly taking care of the children in Diamond's absence. *Id.* at 11.

[15] Immediately before William began his testimony, the trial court admonished the jury as follows:

With Mr. Miller's testimony the Court is giving you another admonition, . . . [that] the testimony you are about to receive from Mr. Miller, until you are further advised by the Court, that this testimony is to be considered as to Defendant Miller only. It is not to be considered in any way, shape, or form against Mr. Larkins. It shall not be commented upon, referred to or in any way considered by the jury against Mr. Larkins.

Tr. Vol. 3 at 5. Then, at the conclusion of William's testimony regarding the frequent bruising he had seen on E.P., the trial court stated as follows:

All right. Ladies and Gentlemen, again, the Court wants to draw the clear distinction of the information that you received up to this point that was admissible against Defendant Miller only. And it was admissible for the purpose for two reasons. One, to show the witness's state of mind as to why he communicated, why he communicated to Ms. Miller about his observations. It also goes to Diamond Miller's state of mind about what knowledge she may have had or what warnings she may have had about the health of her child or the care of her child. Again, you are not to consider it in any way, shape, or form for the truth of the matter, in the sense that there were bruises or whatever, he is not a medical expert. Nor has he testified in any way at this point that he saw anyone, especially and including Mr. Larkins create these injuries. That's why you're not permitted to use it against Mr. Larkins in any way, shape, or form. Because he doesn't have that information and you've not heard it. So it's only allowed for those two purposes, his state of mind as to why he said what he said, if you find that he said it, and Ms. Miller's state of mind if she heard it and what she knew or may not have known about any warnings about Mr. Larkins. That's the only thing you can use it for. . . .

*Id.* at 11-12. The trial court asked the jurors to indicate whether they did not understand the admonishment, and none of the jurors so indicated. The trial

court also instructed the jury in relevant part as follows: "Any evidence which was limited to one defendant should not be considered by you as to any other defendant. You should give separate consideration to each defendant." Appellant's App. Vol. 2 at 102.

[16] Larkins contends that he was denied a fair trial because "William's testimony about the bruises, and his opinion regarding their source, would not have been admissible [under Indiana Evidence Rule 404(b)] if Larkins had been tried alone." Appellant's Br. at 31. And Larkins maintains that he was prejudiced by that testimony and that the trial court's admonitions and instructions "did not eliminate the prejudice." *Id.* We cannot agree.

[17] First, it is well settled that we presume the jury followed the trial court's admonishments and that the excluded testimony played no part in the jury's deliberation, *Francis v. State*, 758 N.E.2d 528, 532 (Ind. 2001), and when the jury is properly instructed, we presume they followed such instructions. *Weisheit v. State*, 26 N.E.3d 3, 20 (Ind. 2015) (citation omitted). Indeed, as the State points out, it appears that the jury disregarded William's testimony altogether in that it acquitted Diamond of the neglect of a dependent charge based on her conduct in leaving E.P. in Larkins' care despite having been notified that Larkins might be abusing E.P.[4] Further, during deliberations, the jury asked the trial court for information regarding any "Child Protective

---

[4] The jury convicted Diamond of neglect of a dependent based on her failure to timely obtain medical treatment for E.P.

Service records," "witnesses of any abuse of the children," and "any criminal record of Frank Larkins." Appellant's App. Vol. 2 at 135. Those questions suggest that the jury did not improperly consider William's testimony in determining Larkins' guilt. Larkins has not shown that he was denied a fair trial as a result of William's testimony.

[18] Moreover, we reject Larkins' contention that "William's testimony about the bruises, and his opinion regarding their source, would not have been admissible if Larkins had been tried alone." Appellant's Br. at 31. To the contrary, that testimony might have been admissible in a separate trial against Larkins under an exception to Evidence Rule 404(b), which provides that evidence of prior bad acts may be admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. For example, in *Clemons v. State*, 610 N.E.2d 236 (Ind. 1993), during the defendant's trial on charges that he had abused one of his twin sons, the State introduced evidence that the defendant had previously abused his other twin son. Our supreme court held that such evidence was admissible to show the defendant's *modus operandi*, identity, absence of mistake, or lack of accident. *Id.* at 242-43. Again, Larkins has not shown that he was denied a fair trial because of the trial court's admission of William's testimony regarding his suspicions that Larkins had previously abused E.P.

[19] Finally, Larkins contends that he was prejudiced by William's testimony because the trial court prohibited his defense counsel from cross-examining William. In support of that contention, Larkins cites *Bruton v. United States*, 391

U.S. 123, 126 (1968), where the Supreme Court held that the trial court's admission of a codefendant's confession into evidence at a joint trial violated the defendant's right to cross-examination. Larkins concedes that *Bruton* "is not directly on point," but he maintains that, "as in *Bruton*, the testimony would not have been admissible if Larkins had been tried alone, and it was not subject to cross-examination." Appellant's Br. at 9. But, again, William's testimony might have been admissible at a separate trial. Further, during the joint trial, William *was* subject to thorough cross-examination by Diamond's defense counsel, and Larkins does not assert that he would have elicited different testimony from William if he had been permitted to cross-examine him. Again, Larkins has not demonstrated that he was denied a fair trial. The trial court did not abuse its discretion when it denied Larkins' motion to sever.

### Issue Two: Sufficiency of the Evidence

[20] Larkins contends that the State presented insufficient evidence to support his convictions. Our standard for reviewing the sufficiency of the evidence needed to support a criminal conviction is as follows:

> First, we neither reweigh the evidence nor judge the credibility of witnesses. Second, we only consider the evidence supporting the [verdict] and any reasonable inferences that can be drawn from such evidence. A conviction will be affirmed if there is substantial evidence of probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. It is the job of the fact-finder to determine whether the evidence in a particular case sufficiently proves each element of an offense, and

we consider conflicting evidence most favorably to the trial court's ruling.

*Willis v. State*, 27 N.E.3d 1065, 1066-67 (Ind. 2015) (citations and quotation marks omitted).

### *Aggravated Battery*

[21] To prove aggravated battery, as a Level 1 felony, the State was required to show that Larkins knowingly or intentionally inflicted injury on E.P., that is, a lacerated pancreas and/or a lacerated duodenum, that created a substantial risk of death and did result in the death of E.P., who was under the age of fourteen. *See* Ind. Code § 35-42-2-1.5 (2017). Larkins maintains that the State did not prove beyond a reasonable doubt that he was the person who injured E.P. Larkins asserts that no one "ever saw [him] hitting or abusing" E.P.; he did not make any incriminating statements; and there is no physical evidence implicating him. Appellant's Br. at 18. And Larkins contends that the injury to E.P. "could have been inflicted any time between 10:00 a.m. on Monday, [when E.P. was in William's care], and 9:30 p.m. on Monday, when [E.P.] started exhibiting symptoms." *Id.* at 19. Larkins maintains that "seven different adults had access to" E.P. during that time frame and, thus, each had the opportunity to hurt E.P. *Id.*

[22] Larkins' contentions amount to a request that we reweigh the evidence, which we will not do. Dr. Harris explained how E.P. would have reacted to the injury that led to his death:

It would have been a very painful injury. So *he certainly would have been crying and would have been indicating pain to that area of his abdomen*. Smaller babies can't always tell us exactly where it hurts, but a twenty[-]month[-]old can. So I would expect him to have been indicating abdomen pain, crying, upset. After that he may have calmed down some. But this type of injury causes increasing pain over time and increasing discomfort with movement. So if he held perfectly still he may have been able to decrease or control his pain somewhat. But moving around would have been really uncomfortable.

Tr. Vol. 3 at 85 (emphasis added). The State presented evidence that E.P. showed no signs of injury, either crying or indicating pain, prior to his return home with Larkins on Monday evening. Thus, Larkins' contentions that William, William's neighbor,[5] Bryant, or Tramble may have inflicted the injury to E.P. are without merit. To the extent Larkins contends that his eighty-five-year-old great grandmother may have inflicted the injury to E.P., Larkins does not direct us to any evidence suggesting either that she had the physical strength to inflict the injury or that she was ever alone with E.P. on Monday evening. Finally, Larkins asserts that Diamond may have inflicted the injury on E.P., but the State presented evidence that E.P. was already exhibiting symptoms of the injury when Diamond arrived home from work on Monday evening.

[23] Further, we disagree with Larkins that he did not make incriminating statements. When EMTs and police arrived at the residence on Wednesday

---

[5] Larkins states that a neighbor visited William over the weekend when E.P. was staying with William.

morning, Larkins stated that E.P. had been awake that morning and had shown signs of life as Larkins performed CPR on him. But the undisputed evidence showed that E.P. exhibited rigor mortis that morning and that E.P. had been dead for an extended period of time. Dr. Harris testified that "false histories [are] provided more often when injuries have been inflicted" by the person reporting the history. *Id.* at 98. In addition, at the scene, shortly after the EMTs had declared that E.P. was dead, Larkins asked questions about the deputy coroner's ability to find the cause of the abdominal injury to E.P., which seemed inappropriate under the circumstances.

[24] In sum, the State presented evidence that E.P. sustained a blunt force injury to his abdomen during the evening of October 27, when he was home with Larkins, D.P., and Larkins' elderly great grandmother. Again, E.P. was exhibiting signs of the injury when Diamond arrived home from work that evening. We hold that the State presented sufficient evidence to support Larkins' aggravated battery conviction.

### *Neglect of a Dependent*

[25] To prove neglect of a dependent, as a Level 1 felony, the State was required to show that Larkins, being at least eighteen years of age and having the care of E.P., a dependent less than fourteen years of age, did knowingly place E.P. in a situation that endangered E.P.'s life or health, that is, failed to obtain timely medical treatment for E.P. and which resulted in the death of E.P. *See* I.C. § 35-46-1-4. Larkins contends that "there is no evidence that E.P.'s need for medical care was apparent, or that Larkins was actually and subjectively aware

of that need." Appellant's Br. at 25. Larkins asserts that E.P.'s fatal injury was internal and exhibited no "external bruising or damage." *Id.* And Larkins maintains that he reasonably believed that E.P. was suffering from a stomach virus that did not require immediate medical attention. We cannot agree.

[26]　First, we note that Diamond made similar arguments in her brief on appeal, which another panel of this court rejected. In *Miller*, we held as follows:

> In the context of a neglect conviction resulting from the alleged failure to provide timely medical care, it has been established that "[w]hen there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the jury to infer that the defendant knowingly neglected the dependent." *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind. 2000), *abrogated on other grounds*, 924 N.E.2d 643 (Ind. 2010).
>
> Miller insists that the evidence establishes only that her child was vomiting and feeling unwell, and that a reasonable parent would not necessarily have sought medical attention within the first twenty-four hours of such symptoms. The record readily reveals symptoms far beyond vomiting, however:
>
> • Monday night, E.P. did not want to eat, was complaining of stomach pain, and was lethargic and sleepy.
>
> • Throughout the day on Tuesday, E.P.'s pain worsened. He was thirsty and attempted to drink fluids, but vomited up everything he took in.
>
> • Dr. Harris testified that throughout this time, E.P.'s pain and discomfort would have escalated, causing him to cry and try to be as still as possible, which Miller testified that, in fact, he did.

• Tuesday night, Miller observed that E.P. could not sleep because of his pain and heard him groaning as he remained motionless to control the pain. She fell asleep that night to the sound of his moans.

• Dr. Harris testified that throughout this period, E.P.'s abdomen would have become more and more bloated until it was visibly bloated and very tense. That was, in fact, the state of his abdomen when the paramedic found the child dead on Wednesday morning.

We agree with Miller that, if vomiting had been E.P.'s only symptom, a conviction for neglect would likely be unwarranted. Here, however, the jury reasonably rejected that argument, concluding that E.P. had many other troubling symptoms that would have caused an average layperson to seek medical treatment for the child.

Slip op. at 2-3.

[27] We agree with the analysis in *Miller* and hold that, given the evidence, the jury reasonably concluded that Larkins was also guilty of neglect of a dependent as charged. Moreover, because the State presented sufficient evidence to prove that Larkins inflicted the life-threatening injury upon E.P., that is further evidence that Larkins was subjectively aware that E.P. required medical treatment. *See Lush v. State*, 783 N.E.2d 1191, 1197 (Ind. Ct. App. 2003). In other words, the evidence shows that Larkins "was in a position to understand the urgency of the situation and that medical attention was needed." *Id.* We hold that the State presented sufficient evidence to support Larkins' conviction for neglect of a dependent.

Affirmed.

Riley, J., and Bradford, J., concur.